CHRISTOPHER A. CROFTS
United States Attorney
NICHOLAS VASSALLO
Assistant United States Attorney
District of Wyoming
P.O. Box 668
Cheyenne, WY 82003-0668
Telephone: (307) 772-2124
Fax: (307)772-2123

DRAKE CUTINI (*Pro Hac Vice Pending*)
Trial Attorney
Department of Justice
Civil Division
P.O. Box 386
Washington, D.C. 20044
Tel: 202-307-0044
Fax: 202-514-8742

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| CODY LABORATORIES, INC., et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE HONORABLE KATHLEEN )<br>SEBELIUS, Secretary of Health )<br>and Human Services, et al., )<br>)<br>Defendants. ) | Civil No. 2:10-cv-00147-ABJ |

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
## TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### INTRODUCTION

Forty-eight years after Congress declared that all prescription drugs would require

approval by the United States Food and Drug Administration ("FDA" or the "Agency") to be

lawfully distributed in interstate commerce, 15 months after plaintiffs Lannett Company, Inc.,

and its wholly-owned subsidiary, Cody Laboratories, Inc. (and seven other similarly-situated

companies), were notified by FDA that their product may be the target of regulatory action, and

three days before the FDA-announced deadline, plaintiffs (but not the other companies) seek

emergency relief to prohibit FDA from taking enforcement action to halt their distribution of an unapproved narcotic. Plaintiffs' motion is baseless and their last-minute plea for relief from this Court should be denied.

In April 2009, FDA informed plaintiffs and all manufacturers situated similarly to plaintiffs that they would be subject to enforcement action 180 days after any firm receives approval to market the morphine sulfate drug in question. In the same letter, FDA encouraged all of the firms to obtain approval. This action was part of FDA's long-standing and statutorily mandated attempt to ensure that all unapproved products that are on the market obtain FDA approval (not just plaintiffs' product). One of the manufacturers of morphine sulfate, Roxane Laboratories, submitted its application in 2009 and received approval in January 2010. Thus, plaintiffs have known since early 2009 that their drug could be subject to enforcement action, and since January 2010 they have known the exact date. Nonetheless, plaintiffs waited until three days before the deadline to file this lawsuit. This behavior is unconscionable and should not be tolerated by this Court.

Plaintiffs contend that if they are subject to enforcement action they would suffer irreparable harm. However, plaintiffs are not specific about the exact nature of this harm. In fact, plaintiffs concede that the product in question is only one-third of their sales and that this product has been losing market share since December 2009. The government cannot be responsible for any losses that occurred while plaintiffs delayed bringing this case until three

2

days before the deadline. The vague and speculative nature of plaintiffs' allegation of harm

prevent that "harm" from rising to the level of an irreparable injury sufficient to justify the

imposition of the drastic remedy plaintiffs seek.

 In any event, plaintiffs have no likelihood of success on the merits of their claim. All that

FDA has done at this point is issue a warning letter to plaintiffs. It has taken no enforcement

action. Such a warning letter does not present final agency action that is subject to judicial

review. FDA issues hundreds of warning letters each year, and if regulated parties could

challenge these warning letters as final agency action, it would severely hinder FDA from

performing its statutory duty to protect the public health. Also, the Supreme Court long ago

established that courts lack jurisdiction to enjoin FDA's enforcement proceedings under the

Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-399a ("FDCA" or "Act"), the very

relief plaintiffs seek here. *See Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594 (1950).

Thus, because this Court has no jurisdiction to review nonripe, nonfinal agency action or to

enjoin a hypothetical enforcement action, plaintiffs have no likelihood of success on the merits.

 Even if jurisdiction existed, plaintiffs' claims are meritless and must be rejected.

Plaintiffs' claim that their drug has "grandfather" status has no support. Among other things, one

of the requirements in order for a drug to be "grandfathered" is that the labeling of the drug in

question must be the same as it was before 1938 (this is the grandfather provision relied on by

plaintiffs). Because plaintiffs concede that they did not market the drug until the last five years,

3

it is impossible for them to be "grandfathered." *See generally United States v. Allan Drug Corp.*,

357 F.2d 713 (10th Cir. 1966).  This is not a remotely close question, and for this reason alone

plaintiffs' motion should be denied.  In fact, if plaintiffs' argument were accepted, then anyone

could market a drug that was on the market prior to 1938 and claim that it was "grandfathered" –

and thus avoid FDA approval.  This is an absurd argument.

      As FDA has explained, it is due to limited agency resources and the piecemeal nature of

federal drug regulation that plaintiffs (and others) have been able to market unapproved drugs for

so many years.  It is not because the products are "grandfathered."  As explained below, for many

years FDA has been undertaking the process to ensure that all drug products on the market are

approved, and thus safe and effective for their intended uses.  This is not a new development, as

plaintiffs seem to contend.

      Nor has FDA treated plaintiffs unfairly.  As noted above, FDA encouraged all

manufacturers to submit applications.  In situations where approval of a product would result in

the availability of a drug where no adequate treatment exists–such as when there are no products

that have gone through the rigorous application process and obtained FDA approval, FDA will

prioritize its review of a marketing application, which FDA did here with respect to the first

submitted application.  The fact that FDA has not prioritized its review of subsequent marketing

applications for this product in no way constitutes unfair treatment of those subsequent

4

applicants, but rather a reflection of FDA's consistent and long-standing policies with respect to how it reviews drug applications.

In fact, plaintiffs have applied to have their drug approved. However, they did not file their application until after Roxane had already been approved. Under FDA's timetable, FDA will make a decision on plaintiffs' product in January 2011. Plaintiffs must await the results of this decision, and they have no basis to invoke the drastic remedy of preliminary relief because another company obtained approval before them and they want to continue to market their unapproved drug. For these reasons, as explained in greater detail below, plaintiffs' motion should be denied.

## BACKGROUND

### I.   Statutory and Regulatory Scheme

The manufacture and distribution of drugs in the United States is governed by the FDCA, which provides that "no person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed [with FDA] . . . is effective with respect to such drug." 21 U.S.C. § 355(a). A new drug application ("NDA") must contain, among other information, "full reports of investigations" showing that "such drug is safe for use and . . . effective in use." *Id.* § 355(b); *see also id.* § 355(j) (permitting generic drugs to submit an ANDA in which they demonstrate safety and efficacy by reference to an approved NDA).

FDA is charged with enforcing the FDCA and may take enforcement action, including injunction and seizure, to remove unapproved new drugs from the market. *Id.* §§ 331-32, 334, 371(a).

Comprehensive federal regulation of drugs has developed over time. Congress' first significant public health law, the Federal Food and Drugs Act of 1906, prohibited the sale of drugs that were adulterated and misbranded but did not require that drugs receive premarket approval. Pub. L. No. 59-384, 34 Stat. 768. Not until 1938, when Congress enacted the FDCA, were drug manufacturers required to obtain premarket approval by submitting reports of safety investigations and proposed drug labeling to FDA for review. Pub. L. No. 75-717, 52 Stat. 1040; *see also Wyeth v. Levine*, 129 S. Ct. 1187, 1195 (2009) (observing that the 1938 Act's "most substantial innovation" was that a manufacturer was prohibited from distributing a drug until its application became effective and FDA was permitted to "reject an application if it determined that the drug was not safe for use as labeled"). In 1962, Congress amended the FDCA to require drug manufacturers to submit additional evidence, including adequate and well-controlled clinical investigations, to FDA establishing that their drugs are not only safe but also effective "under the conditions of use prescribed, recommended, or suggested in the proposed labeling" before the drugs can be legally marketed. Pub. L. No. 87-781, § 102(d), 76 Stat. 780, 781 (codified at 21 U.S.C. § 355(d)).

In enacting and in amending the FDCA, Congress exempted from the new drug safety and effectiveness requirements drugs that met the requirements of two narrow "grandfather

6

provisions" within the Act. *United States v. Rutherford*, 442 U.S. 544, 548 (1979). The 1938

grandfather clause exempts from the FDCA "new drug" definition "any drug that was subject to

the Pure Food and Drug Act of 1906, if its labeling retained the same representations concerning

conditions of use made prior to 1938."[1]  *Id.* at 548 n.3.  This exemption, now codified at 21

U.S.C. § 321(p), states that a "new drug" is:

> "Any drug . . . not generally recognized, among experts qualified by scientific
> training and experience to evaluate the safety and effectiveness of drugs, as safe
> and effective for use under the condition prescribed, recommended, or suggested
> in the labeling thereof, except that such a drug not so recognized shall not be
> deemed to be a 'new drug' if at any time prior to the enactment of this Act
> [enacted June 25, 1938] it was subject to the Food and Drugs Act of June 30,
> 1906, as amended, and if at such time its labeling contained the same
> representations concerning the conditions of its use . . . ."

(emphases added).  Thus, under the 1938 grandfather clause, a manufacturer need not submit an

NDA to establish a drug's safety if that drug was on the market prior to passage of the 1938 Act

and has retained in its labeling the identical representations concerning the conditions of use as it

had prior to passage of the 1938 Act.[2]  "Conditions of use include, among other things, what the

drug is recommended for, how it is to be administered, and in what quantities it is to be

administered."  Laetrile Comm'r's Decision, 42 Fed. Reg. 39,768, 39,792 (1977) (setting forth

FDA's interpretation of the scope and application of the FDCA's grandfather clauses, which was

---

[1]  Plaintiffs assert that they have been marketing their product "more than five years."  Pl.
Mem. at 2.

[2]  Because plaintiffs' product did not exist in 1938, it cannot be "grandfathered" under
this provision.

subsequently reviewed and upheld by the Tenth Circuit in *Rutherford v. United States*, 616 F.2d

455, 457 (10th Cir. 1980)).

When Congress amended the FDCA in 1962, it added a second grandfather clause, which

provided that:

> In the case of any drug which, on the day immediately preceding the enactment
> date [October 9, 1962], (A) was commercially used or sold in the United States,
> (B) was not a new drug as defined by [21 U.S.C. 321(p)] of the basic Act as then
> in force, and (C) was not covered by an effective application under section 505 of
> that Act, the amendments to [21 U.S.C. § 321(p)] made by this Act shall not apply
> to such drug when intended solely for use under conditions prescribed,
> recommended, or suggested in labeling with respect to such drug on that day.

Pub. L. 87-781, § 107 (c)(4), 76 Stat. 780, 789 (emphasis added).

Unlike the 1938 grandfather clause, the 1962 grandfather clause does not exempt a drug

from the "new drug" definition found in 21 U.S.C. 321(p). Rather, if satisfied, "the 1962

grandfather clause simply relieved manufacturers of pre-1962 drugs from having to demonstrate

the effectiveness of their drugs." *United States v. Articles of Drug . . . 5,906 Boxes*, 745 F.2d

105, 108 (1st Cir. 1984) ("[S]afety . . . has been a requirement for exemption from new drug

approval procedures since 1938.").

The 1962 grandfather clause, which was contained in the transitional provisions of the

Act's amendments, was Congress' answer to "the problem of the application of the new drug

efficacy provisions to drugs already on the market" in 1962. *USV Pharm. Corp. v. Weinberger*,

412 U.S. 655, 662 (1973). "Without transitional protection all drugs—except those marketed

8

prior to the 1938 Act whose labeling had not been changed and which were exempt from the 'new drug' provision of [21 U.S.C. 321(p)]—would have been in violation of the amended Act unless generally recognized as effective." *Id.* The transitional amendments required FDA to conduct a retrospective evaluation of the effectiveness of the thousands of products that FDA had approved as safe between 1938 and 1962. *See id.* at 663.

The language of the transitional provisions, including the language of the 1962 grandfather clause, was never codified. Instead, "[t]he 1962 Amendment simply added the words 'and effectiveness' after the word 'safety' and the words 'and effective' after the word 'safe'" in the "new drug" definition and "perpetuated verbatim" the statutory language of the 1938 grandfather clause. *Allan Drug Corp.*, 357 F.2d at 717; *see also id.* at 718 ("While the exempting language of the basic Act [the 1938 grandfather clause] and the Amendment [the 1962 grandfather clause] is verbally different, they are undoubtedly intended to mean the same thing."). As such, in considering whether a drug qualifies for either of the two grandfather clauses, FDA reviews the same information. *See* 21 C.F.R. § 314.200(e)(2) (setting forth the materials to be submitted by a manufacturer, including "the formulas, labeling, and evidence of marketing," to support a claim that a drug is exempt from the new drug safety and effectiveness requirements under the1938 and 1962 grandfather clauses).

The term "drug" in the FDCA's "new drug" definition, 21 U.S.C. § 321(p), refers to an entire finished drug product and not just the drug product's active ingredients. *See United States*

9

*v. Generix Drug Corp.*, 460 U.S. 453, 454, 460 (1983) (rejecting the contention "that the term

'drug' means only the active ingredient in a product" and holding that "drug" refers "to the entire

product"). Thus, in order to be exempt from the new drug definition under the 1938 grandfather

clause, a manufacturer must prove that "the <u>identical</u> drug," including all inactive ingredients,

was on the market between 1906 and 1938, and that its "labeling with respect to . . . conditions of

use has undergone <u>no changes whatsoever</u>" and its "composition is <u>completely identical</u> to its

composition" prior to enactment of the FDCA in 1938.  42 Fed. Reg. at 39,788 ("The proof

required would necessarily involve the production of quantitative formulas, labeling, and

evidence of marketing both for the pre-1938 use and for the present use.") (emphases added); *see*

*also Allan Drug Corp.*, 357 F.2d at 718-19 (holding that a drug product "loses the immunity of

the Grandfather clause and becomes a new drug" subject to the FDCA's premarket approval

requirements even where there is no more than a "mere change in the labeling after the effective

date of the Act").

     Similarly, in order "for the 1962 grandfather clause to apply, the identical drug must have

been used or sold in 1962" and none "of the ingredients in the drug, or the proportions in which

those ingredients appeared in the drug," may have changed.  42 Fed. Reg. at 39,791 (finding that

drugs that had "no set composition" and whose "makeup varie[d] depending upon the

manufacturer and the time of manufacture" did not qualify for the 1962 grandfather clause).

Even a change in an inactive ingredient will render a drug a "new drug." *United States v. Article*

*of Drug . . . Entrol-C Medicated*, 513 F.2d 1127, 1129 (9th Cir. 1975); *see also* 21 C.F.R.

§ 310.3(h) ("The newness of a drug may arise by reason . . . of: (1) The newness for drug use of

any substance which composes such drug, . . . whether it be an active substance or . . . other

component."). Any changes in a drug's labeling are also "sufficient to take [the drug] out of the

[1962] grandfather clause and place it squarely within the requirements of the Act." *Articles of

Drug . . . 5,906 Boxes*, 745 F.2d at 114 (finding that the requirements of the clause were not met

when a drug manufacturer had engaged in "voluntary relabeling to eliminate questionable uses"

and added a safety warning regarding use in children). Thus, "the several requirements" of the

1962 grandfather clause cannot be met when a drug has not exhibited "consistency in [its]

formula" and "consistent labeling . . . since October of 1962." *Rutherford*, 616 F.2d at 457; *see

also USV Pharm. Corp.*, 412 U.S. at 663 (holding that drugs can qualify for the 1962 grandfather

clause's exemption only "so long as their composition and labeling remained unchanged").

      "[A]s an exemption to a comprehensive regulatory statute concerned with public safety,

the grandfather clause is to be strictly construed, and [a drug manufacturer] bears the burden of

proof as to each condition." *Articles of Drug . . . 5,906 Boxes*, 745 F.2d at 113; *see also Allan

Drug Corp.*, 357 F.2d at 718 ("Since we are dealing with a Grandfather Clause exception, we

must construe it strictly against one who invokes it."); *Durovic v. Richardson*, 479 F.2d 242, 250

(7th Cir. 1973) (same); *United States v. An Article of Drug (Bentex Ulcerine)*, 469 F.2d 875, 878

(5th Cir. 1972) (same). Although the defense that a drug is grandfathered has been raised many

times, it is extremely rare for a court to find that a drug falls within either the 1938 or 1962

grandfather clause. *See* Peter Barton Hutt et al., *Food and Drug Law*, 599 (3d ed. 2007) ("No

drug has yet been judicially determined to fall within the 1938 or 1962 grandfather clause."); *but*

*see United States v. Lanpar Co.*, 293 F. Supp. 147, 152 (N.D. Tex. 1968) (finding that drugs

were marketed "prior to the enactment of the [FDCA]" and at such time "contained the same

representations concerning conditions of their use as now" but ordering them destroyed because

they were adulterated – a ruling the government did not appeal). This is hardly surprising in that

"[v]ery few drug products have labeling that has not changed in any respect since 1938" and

"most drug products have changed their formulations in some respect in the last 45-plus years."

Donald O. Beers, *Generic and Innovator Drugs: A Guide to FDA Approval Requirements*,

§ 1.04[E] (7th ed. 2008); *see also FDA Marketed Unapproved Drugs – Compliance Policy Guide*

("Unapproved Drugs CPG"), Sec. 440.100 (June 2006) at 11 ("[T]he Agency believes it is not

likely that any currently marketed prescription drug product is grandfathered or is otherwise not a

*new drug. . . .* In light of the strict standards governing exceptions to the approval process, it

would be prudent for firms marketing unapproved products to carefully assess whether their

products meet those standards.") (this Compliance Policy Guide is plaintiff's Exhibit A).

## II.     FDA's Enforcement Policy Regarding Marketed Unapproved Drugs

FDA estimates that "perhaps as many as several thousand drug products are marketed

illegally without required FDA approval." *Unapproved Drugs CPG* at 2. This is largely

attributable to the piecemeal development of federal drug regulation. *See id.* at 8-12 (describing

various "historical reasons" that unapproved drugs remain on the market). For instance, the

transitional provisions of the 1962 amendments to the FDCA permitted about 3,400 drugs, which

had been approved based only on FDA's evaluation of their safety between 1938 and 1962, to

remain on the market until FDA could complete a review of those drugs' effectiveness. *See*

*Weinberger v. Hynson, Westcott & Dunning*, 412 U.S. 609, 614 (1973). That review began in

1962 and continues today. *See, e.g.*, *Trimethobenzamide Hydrochloride Suppositories;*

*Withdrawal of Approval*, 72 Fed. Reg. 17,556 (Apr. 9, 2007) (announcing the withdrawal of

FDA approval for a drug as part of FDA's ongoing Drug Efficacy Study implementation

("DESI") program); *see also Hoffman-LaRoche Inc. v. Weinberger*, 425 F. Supp. 890, 894

(D.D.C. 1975) (criticizing FDA for "permitting new drugs to be marketed without an approved

[NDA]" and stating that a lack of "administrative resources to insure compliance . . . cannot be

permitted to postpone to some indefinite future date the implementation" of a "clear statutory

requirement").

    As part of its continuing effort to rid the market of unapproved drugs, but recognizing

that limited agency resources would prevent FDA from taking immediate action against all such

drugs, FDA issued the first version of the Unapproved Drugs CPG in 1976. *See United States v.*

*Sage Pharms., Inc.*, 210 F.3d 475, 478-79 (5th Cir. 2000). At that time, FDA "acknowledge[d]

the presence of unapproved drugs on the market, . . . and reaffirm[ed] that all [unapproved

drugs] . . . are new drugs, and therefore, require an approved NDA or ANDA for marketing." *Id.* (quotation marks omitted). FDA issued the most recent version of the CPG in 2006, in an effort "to (1) clarify for . . . the regulated industry how we intend to exercise our enforcement discretion regarding unapproved drugs and (2) emphasize that illegally marketed drugs must obtain FDA approval." *Unapproved Drugs CPG* at 2.

The Unapproved Drugs CPG explains that FDA employs a "risk-based approach" in its regulatory efforts involving unapproved drug products, and it sets forth specific factors that may cause FDA to prioritize enforcement actions against certain unapproved drugs. *Id.* at 2-3; *see also Sage Pharms.*, 210 F.3d at 479 (acknowledging that the CPG is FDA's reasonable response to being "[c]onfronted with limited resources and a multitude of unapproved drugs already on the market"). Among these are drugs that have potential safety risks, and drugs that threaten the new drug approval process by competing directly with an approved drug. *Unapproved Drugs CPG* at 3-5, 7 (explaining that removal of unapproved drugs from the market in the latter situation provides an incentive for manufacturers to expend the requisite effort and financial commitment to obtain an approved NDA); *see also* FDA Center for Drug Evaluation and Research, *Review Classification Procedure*, MAPP 6020.3 (explaining that "priority review" for an NDA may be available where there is no approved alternative therapy), *available at* http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ManualofPolicies Procedures/UCM082000.pdf. When a company obtains approval to market a drug that other

14

companies have been marketing illegally, FDA may, in its discretion, allow a grace period before

the initiation of any enforcement actions to permit manufacturers and consumers to adjust to the

imminent removal of the unapproved products from the market. *See Unapproved Drugs CPG* at

5-6.

## III.   Regulatory History of Plaintiffs' Drug

For the past five years, plaintiffs have manufactured and distributed a prescription

morphine sulfate solution to be administered orally for the relief of acute and chronic pain. Pl.

Mem. at 2. Plaintiffs' product lacks an approved NDA and has not been evaluated for safety or

efficacy by FDA. Pl. Mem. at 3. On March 30, 2009, plaintiffs each received an FDA warning

letter informing them that the marketing of their product "without an approved application

constitutes a violation of [the FDCA]" and that "[f]ailure to promptly correct these violations

may result in legal action without future notice, including, without limitation, seizure and

injunction." Pl. Mem., Exs. C & D.[3]  FDA initially stated that it would allow a 60-day grace

period for plaintiffs to continue manufacturing and a 90-day grace period for them to continue

distribution of their product. *Id.*

On the same day that FDA sent warning letters to plaintiffs, FDA sent warning letters to

other manufacturers of similarly unapproved narcotics. *See* Q&A for Consumers about FDA's

---

[3] *See* FDA, Regulatory Procedures Manual, ch. 4, § 4-1-1 (Mar. 2009) ("Warning letters are issued to achieve voluntary compliance and to establish prior notice."), available at http://www.fda.gov/ ICECI/Compliance Manuals/RegulatoryProceduresManual/default.htm.

15

Action Involving Unapproved Narcotics (listing the nine firms that received warning letters for unapproved narcotics), *available at* http://www.fda.gov/Drugs/GuidanceComplianceRegulatory Information/EnforcementActivitiesbyFDA/SelectedEnforcementActionsonUnapprovedDrugs/uc m165587.htm. In its public announcement, FDA explained that it was taking action against marketers of unapproved high concentration morphine sulfate solutions, in part, because a comparable approved product had recently become available: 20 mg/5ml oral solution of morphine sulfate manufactured by Roxane Laboratories, Inc. ("Roxane"). *Id.*

After FDA issued the nine warning letters, it "heard from the pain management community that the impending market removal of unapproved morphine sulfate oral solution 20 mg/ml products," which were marketed by plaintiffs and others, "would impose extreme hardship on palliative care patients and their families" because the approved product was a lower concentration (20 mg/5ml) and some patients had difficulty swallowing even small doses of liquids. Pl. Mem., Ex. D. Accordingly, on April 9, 2009, FDA sent follow-up letters informing plaintiffs and others that it would "extend the period of enforcement discretion set forth in the warning letters to ensure that palliative care patients have access to morphine sulfate oral solution 20 mg/ml," and that the new grace period would run from "180 days after any firm receives approval for a morphine sulfate oral solution 20 mg/ml product." *Id.* The letters encouraged plaintiffs to contact an employee in FDA's Office of New Drugs (whose name and phone number were given in the letters) about obtaining the approval for their product. *Id.*

16

On May 1, 2009, counsel for plaintiffs responded to the warning letters and asserted that

Plaintiffs' product was exempt from the FDCA's new drug approval requirements because it met

the requirements of the 1938 grandfather clause. Pl. Ex. F. But the letter also acknowledged

that plaintiff Lannett had "begun work" on an NDA application but would "need some guidance

concerning the data expected in the application" and that it was expected "that the [FDA]

reviewing division would help advise Lannett throughout this process." *Id.* at 6. On May 6,

2009, FDA received a request from plaintiff Lannett for a pre-Investigational New Drug (IND)

application meeting. Pl. Mem. at 7. (An IND is the first step in the approval process and

necessarily precedes the submission of an NDA). FDA informed plaintiff Lannett on May 11,

2009, that its request for a pre-IND meeting had been granted and scheduled for July 1, 2009. *Id.*

On January 25, 2010, FDA approved an NDA from Roxane for a high concentration

20 mg/ml morphine sulfate oral solution—the same concentration as plaintiffs' product.

(Roxane submitted its NDA on August 25, 2009.) Pl. Mem. at 7. Plaintiff Lannett submitted an

NDA for its own 20 mg/ml morphine sulfate oral solution on February 25, 2010, a month after

FDA had approved Roxanne's product.[4] *Id.* On March 1, 2010, FDA sent letters to plaintiffs

and five other remaining marketers of 20 mg/ml morphine sulfate oral solution, informing them

---

[4] The Prescription Drug User Fee Act ("PDUFA"), which mandates that FDA meet
certain performance benchmarks, prescribes a 10-month deadline for FDA's standard review of
an NDA. *See* Food and Drug Administration Amendments Act of 2007, Pub. L. 110-85, §§ 101-
109, 121 Stat. 823. Because plaintiff Lannett's NDA was filed in February 2010, and is
receiving standard review, FDA can be expected to make an approval determination regarding
the NDA by January 2011.

that FDA had approved Roxane's NDA and that, in accordance with the terms of the April 9,

2009 letters, FDA would exercise enforcement discretion with regard to the marketing of their

products only until July 24, 2010. Pl. Ex. N.

## ARGUMENT

### Plaintiffs Are Not Entitled to Emergency Relief

To obtain a temporary restraining order or a preliminary injunction, plaintiffs must

demonstrate that: (1) they have a substantial likelihood of success on the merits; (2) they will

suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not

be substantially injured if the requested relief is granted; and (4) granting such relief would serve

the public interest. *See RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *see*

*also E. Shoshone Tribe v. N. Arapaho Tribe*, 926 F. Supp. 1024, 1029 (D. Wyo. 1996) ("A

temporary restraining order is a subspecies of the preliminary injunction.").

A preliminary injunction "constitutes drastic relief to be provided with caution" and

"should be granted only in cases where the necessity for it is clearly established." *United States*

*ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Ent. Mgmt. Consultants, Inc.*, 883 F.2d

886, 888-89 (10th Cir. 1989); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (calling

preliminary injunctive relief an "extraordinary and drastic remedy"). Indeed, as the Supreme

Court has recently made clear, "a party seeking a preliminary injunction must demonstrate . . . a

likelihood of success on the merits," not merely the existence of "questions so serious,

18

substantial, difficult and doubtful, as to make them fair ground for litigation." *Munaf v. Geren*,

553 U.S. 674, —, 128 S. Ct. 2207, 2219 (2008) (citations and quotation marks omitted); *see also*

*Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1299 (10th Cir. 2006) (affirming, "without

reaching the other three factors" the district court's denial of a preliminary injunction where the

moving party "failed to show a substantial likelihood of success on the merits"). Similarly, the

mere "possibility" of irreparable harm is insufficient to justify a preliminary injunction:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to
> demonstrate that irreparable injury is *likely* in the absence of an injunction. . . .
> Issuing a preliminary injunction based only on a possibility of irreparable harm is
> inconsistent with our characterization of injunctive relief as an extraordinary
> remedy that may only be awarded upon a clear showing that the plaintiff is
> entitled to such relief.

*Winter v. NRDC*, 129 S. Ct. 365, 375-76 (2008).

Plaintiffs have failed to establish the requirements for a preliminary injunction. They

have no likelihood of success because the Court has no jurisdiction over their complaint.

Moreover, plaintiffs have not come close to showing that their morphine sulfate oral solution

meets the requirements of the FDCA's grandfather clauses, or that FDA was arbitrary and

capricious in refusing to extend the grace period for marketing of unapproved morphine sulfate

oral solutions and declining to afford priority review to plaintiff Lannett's NDA for the drug.

Inasmuch as plaintiffs began distributing their drug long after it should have been clear to them

that they were engaging in an illegal business, plaintiffs are entitled to no equitable relief.

19

Plaintiffs cannot establish the irreparable harm necessary to warrant emergency relief because they have waited nearly five months to bring this challenge on the eve of the deadline to cease marketing their drug. The alleged injury that they would suffer in the absence of preliminary injunctive relief is nothing more than being required to halt their illegal marketing activities. In addition, the public interest is best served by permitting FDA to fulfill its statutory responsibility to ensure the safety and effectiveness of drugs by removing unapproved narcotics from the market. Accordingly, the Court should deny the motion for preliminary injunction.

## I.      Plaintiffs Have No Likelihood of Success on the Merits

### A.      This Court is Without Jurisdiction over Plaintiffs' Complaint

#### 1.      Courts Have No Jurisdiction to Enjoin FDA Enforcement Actions

Plaintiffs seek declaratory and injunctive relief to prevent FDA from taking any enforcement action to remove their unapproved morphine sulfate solution from the market. Compl. ¶ 1. It has long been established that courts lack jurisdiction to enjoin FDA from initiating enforcement proceedings under the FDCA. *See Ewing*, 339 U.S. 594. Whether an enforcement action is simply contemplated or has already been filed, those subject to enforcement action may not file an anticipatory challenge; they must raise any defenses they have in the enforcement action itself. *Id.* at 598.

*Ewing* involved FDA's execution of 11 separate seizures of a "food supplement" on grounds that it was misbranded under the FDCA because its labeling was misleading with respect

to potential injuries from the product. *Id.* at 596-97. Alleging that the multiple seizure provision of the FDCA violated the Due Process Clause of the Fifth Amendment, the claimant sought and obtained an injunction against the pending actions. On direct appeal, the Supreme Court held that district courts do not have jurisdiction to review an FDA determination to initiate an enforcement action under the FDCA, finding that "[j]udicial review of this preliminary phase of the administrative procedure does not fit the statutory scheme nor serve the policy of the FDCA." *Ewing*, 339 U.S. at 600.

The Supreme Court reaffirmed the *Ewing* principle in *Abbott Laboratories*, calling the *Ewing* decision "quite clearly correct." *Abbott Labs. v. Gardner*, 387 U.S. 136, 147 (1967). As the Court observed, "[t]he drug manufacturer in *Ewing* was quite obviously seeking an unheard-of form of relief which, if allowed, would have permitted interference in the early stages of an administrative determination as to specific facts, and would have prevented the regular operation of the seizure procedures established by the [FDCA]." *Abbott Labs.*, 387 U.S. at 148.

The *Ewing* rule has also been "consistently and strictly observed" by the lower courts, which have interpreted the decision to "preclude[] judicial interference with the FDA's decision to institute enforcement actions, whatever the precise context." *United States v. Alcon Labs.*, 636 F.2d 876, 881-82 (1st Cir. 1981). In *Southeast Minerals, Inc. v. Harris*, for example, the Fifth Circuit held that the jurisdictional prohibition in *Ewing* "expresses a total and complete proscription on the district court's power both to undertake a pre-enforcement review of the

21

FDA's determination of probable cause and to enjoin federal officials from acting upon that determination by seizing products or initiating enforcement proceedings under the Act." 622 F.2d 758, 764 n.10 (5th Cir. 1980); *see also Premo Pharm. Labs., Inc. v. United States*, 629 F.2d 795, 801 (2d Cir. 1980) (stating that it is "well settled" that federal courts "lack jurisdiction to enjoin seizure actions instituted by the FDA"); *Pharmadyne Labs, Inc. v. Kennedy*, 596 F.2d 568, 570-71 (3d Cir. 1979) (holding that, under *Ewing*, district courts have no jurisdiction to enjoin enforcement actions); *Parke, Davis & Co. v. Califano*, 564 F.2d 1200, 1206 (6th Cir. 1977) (holding "it was an abuse of discretion to enjoin the FDA in the circumstances of this case where pending enforcement actions provided an opportunity for a full hearing before a court").

One of the principal reasons underlying these decisions is that permitting judicial review of agency actions in a forum other than an actual enforcement action would result in inefficient—and unprecedented—judicial review of preliminary agency decisions:

> [I]t has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination.

*Ewing*, 339 U.S. at 599; *see also Alcon Labs.*, 636 F.2d at 886 (stating that "the imposition of any formal, pre-enforcement hearing requirement might seriously impair the effectiveness of the [FDCA]'s enforcement provisions").

Thus, the Supreme Court in *Ewing* has foreclosed the possibility that an injunction, like the one plaintiffs seek here, can be granted to halt FDA enforcement actions. Because plaintiffs are attempting to enjoin an *anticipated* enforcement action, the well-settled precedent applies with all the more force. Such relief would be without foundation and a wholly inappropriate interference with FDA's charge to protect the public health. FDA's ability to enforce its statutory mandate would be frustrated if, prior to even determining that initiation of an enforcement action was warranted, a lawsuit could be brought against the Agency. Because the relief sought by plaintiffs is clearly foreclosed by *Ewing* and its progeny, plaintiffs' complaint must be dismissed.

### 2.     Plaintiffs' Challenge is Not Ripe for Adjudication

The primary purpose of the doctrine of ripeness is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs.*, 387 U.S. at 148-49; *see also Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The Administrative Procedure Act authorizes judicial review only with respect to "final agency action." 5 U.S.C. § 704. Thus, the requirement of final agency action is both part of the ripeness inquiry, as well as an independent basis for dismissal under the APA. In evaluating ripeness, the Court examines whether the issue

23

to be decided is "purely legal" and "whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1237 (10th Cir. 2004) (citation and quotation marks omitted).

Plaintiffs claim that their morphine sulfate solution qualifies for the FDCA's 1938 grandfather clause, thereby exempting their drug from the FDCA's new drug approval requirements. Pl. Mem. at 28, 31-32. Specifically, plaintiffs claim that these pharmaceutical reference materials constitute "labeling" with the meaning of the FDCA and show "that oral solutions of Morphine Sulfate, in this concentration, were on the market between 1906 and 1938." *Id.* By their very nature, plaintiffs' claims cannot be evaluated as a question of pure law. An enforcement action brought on behalf of FDA by the United States Department of Justice, alleging that Plaintiffs' drug may not be legally marketed because its composition and the conditions of use reflected in its labeling have changed since 1938, would provide the appropriate forum to resolve the factual basis for plaintiffs' dispute.

Alternatively, plaintiffs could can file a citizen petition at any time seeking FDA's views as to the claimed grandfather status of their drug, and FDA's response to such a petition constitutes final agency action subject to immediate judicial review under the APA. *See* 21 C.F.R. §§ 10.25, 10.30, 10.45(d). Plaintiffs failed to exhaust this much-utilized procedure under which they could have obtained FDA's view on an administrative record.

If this Court were to become involved in this matter now, it would need to apply the criteria in FDA's regulations to plaintiffs' drug and undertake an evaluation to determine whether plaintiffs' have produced sufficient evidence in support of their claim that their drug meets the requirements of the 1938 grandfather clause and is not a "new drug." *See* 21 C.F.R. § 314.200(e)(2) (requiring FDA to review quantitative "formulas, labeling, and evidence of marketing," for both pre- and post-1938 conditions of use to make a determination on a drug's grandfather status); 21 C.F.R. § 310.3(h) (requiring FDA to determine "[t]he newness for drug use of any substance which composes such drug" as well as "[t]he newness of a dosage, or method or duration of administration or application, or other condition of use prescribed, recommended, or suggested in the labeling"). Such a circumstance "[w]eighs strongly in favor of dismissal" because the court is being "asked to rule on a factual question 'particularly within the agency's bailiwick as opposed to a purely legal question within the primary competence of the courts.'" *Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1, 4 (D.D.C. 1989) (quoting *Pub. Citizen Health Research v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984)); *see also Franks v. Nimmo*, 683 F.2d 1290, 1294 (10th Cir. 1982) (vacating preliminary injunction to permit factual development by the agency and application of the agency's expertise). "The Supreme Court has described the 'new drug' and 'grandfather clause' issues as 'the kinds of issues peculiarly suited to initial determination by the FDA.'" *Alcon Labs.*, 636 F.2d 876, 888 (quoting *Weinberger v. Bentex Pharm., Inc.*, 412 U.S. 645, 653 (1973); *see also Hynson, Westcott & Dunning*, 412 U.S. at 624

25

("FDA is indeed the administrative agency selected by Congress to administer the Act, and it cannot administer the Act intelligently and rationally unless it has authority to determine what drugs are 'new drugs' . . . and whether they are exempt from the efficacy requirements of the 1962 amendments by the grandfather clause of § 107 (c)(4).").

### 3.  Plaintiffs' Have Not Identified Any Final Agency Action

Nor have plaintiffs challenged "final agency action."  Final agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation and quotation marks omitted); *see also Abbott Labs.*, 387 U.S. at 148 (observing that the requirement of finality protects "agencies from judicial interference until an administrative decision has been formalized").  "Plaintiffs have the burden of identifying specific federal conduct and explaining how it is 'final agency action.'" *Colo. Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000).  Plaintiffs have not met, and cannot meet, that burden here.

Plaintiffs seek to enjoin a *possible* future FDA enforcement action to remove their unapproved morphine sulfate oral solution from the market.  Their "claim is not ripe for adjudication" because "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and quotation marks omitted).  Plaintiffs suggest that the warning letters they received as evidence of

that an FDA enforcement action is imminent and inevitable.  Courts have consistently held,

however, that the issuance of a warning letter by FDA does not constitute final agency action ripe

for judicial review for the reasons explained by the court in *Biotics Research Corp. v. Heckler*,

710 F.2d 1375, 1378 (9th Cir. 1983):

> We disagree that the regulatory letters issued to [the plaintiffs] constitute a final
> decision by the FDA.  The letters do contain conclusions by subordinate officials
> of the FDA that products offered by [the plaintiffs] are in violation of federal law
> and also indicate a readiness on the part of the FDA to initiate enforcement
> procedures if corrective measures are not taken.  As the Secretary points out,
> however, such letters do not commit the FDA to enforcement action.

*See also Clinical Reference Lab., Inc. v. Sullivan,* 791 F. Supp. 1499, 1503-04 (D. Kan. 1992)

("Regulatory letters such as the one sent [by FDA], however, do not amount to final agency

action" because "[s]uch letters do not bind the agency to the views expressed in them."), *aff'd in*

*part and rev'd in part on other grounds,* 21 F.3d 1026 (10th Cir. 1994); *Dietary Supplement*

*Coal. v. Sullivan*, 978 F.2d 560, 563 (9th Cir. 1992) (same); *Estee Lauder, Inc.*, 727 F. Supp. at

4-5 (holding that an FDA regulatory letter ordering a manufacturer to alter its labeling and

warning that "the agency is prepared to take the regulatory measures discussed in our previous

letters," was not final agency action because its "language is equivocal—there is no definite plan

of attack on the part of the [FDA]"); *IMS Ltd. v. Califano*, 453 F. Supp. 157, 158-60 (C.D. Cal.

1977) (FDA sent a letter to IMS stating that IMS was in violation of the Food, Drug, and

Cosmetic Act and threatened regulatory sanctions should IMS fail to respond to the letter.

Although the court viewed IMS' challenge as an assertion that FDA had improperly applied a

regulation to IMS' product, it held that the letter did not constitute final agency action); *Schering Corp. v. Heckler*, 779 F.2d 683, 686 n.18 (D.C. Cir. 1985) (statements by FDA officials regarding whether a product was a "new animal drug" and the government's position in previously filed enforcement actions did not constitute final agency action).

In fact, even after the government has instituted civil seizure and condemnation proceedings against products alleged in warning letters to be in violation of the FDCA, the courts have refused to entertain collateral suits challenging the Agency's view. *See Dietary Supplement Coal.*, 978 F.2d at 563-64; *Clinical Reference Lab., Inc.,* 791 F. Supp. at 1504. Similarly, in *Dietary Supplement Coalition*, the court refused to entertain a declaratory judgment suit challenging FDA's view that a product was an unsafe food additive, even though the Agency had previously issued regulatory letters and instituted enforcement proceedings against similar products. 978 F.2d at 563-64; *see also Genendo Pharm. N.V. v. Thompson*, 308 F. Supp. 2d 881, 885 (N.D. Ill. 2003) (holding that "FDA's filing of a forfeiture complaint does not consummate the agency's decision-making process or definitively determine the status of the products seized"); *Schering Corp.*, 779 F.2d at 686 n.18 (finding that FDA statements and positions taken in prior cases regarding the same product did not amount to final agency action).

Indeed, the Supreme Court has held that even the FTC's *issuance* of an administrative complaint was not final agency action subject to judicial review. *FTC v. Standard Oil Co.*, 449 U.S. 232 (1980). The Court reached this result even though the complaint was "definitive" on

the question regarding whether the Commission had "reason to believe" that Standard Oil was violating the Federal Trade Commission Act. *Id.* at 241. The complaint was only a determination that adjudicatory proceedings would commence. Although the Court recognized that the burden of responding to this complaint would be "substantial," it did not constitute irreparable injury. *Id.* at 244. Permitting judicial review of the FTC's complaint would lead to "piecemeal review which at the least is inefficient and upon completion of the agency process might prove to have been unnecessary. . . . Finally, every respondent to a Commission complaint could make the claim that [plaintiff] had made." *Id.* at 242-43 (citations omitted).

Plaintiffs argue that FDA's warning letters constitute "declaratory order" and the agency should have developed a record for them. Pl. Mem. at 25. However, warning letters are not "declaratory orders," and the abundant case law cited above demonstrates they are not final agency action subject to judicial review. Plaintiffs must await an enforcement action or avail themselves of the administrative procedure, described above, available to them.

To date, FDA has taken no action against plaintiffs that constitutes final agency action. Because FDA's warning letters do not represent the consummation of FDA's process, determine any legal rights or obligations, or affect plaintiffs' legal rights, plaintiffs' claims are not ripe for review. For these reasons, the Court has no jurisdiction over plaintiffs' claims, and thus they have no likelihood of success.

29

**B.     Plaintiffs' Drug Does Not Qualify for the 1938 Grandfather Clause Exemption**

Plaintiffs also have no likelihood of success on the merits because, if the United States were to bring the enforcement action that plaintiffs fear, their only defense in such an action – that their drug is grandfathered under the FDCA's 1938 grandfather clause – is one that has been repeatedly rejected by the courts.[5] *See E. Shoshone Tribe*, 926 F. Supp. at 1032 (rejecting a request for a TRO where "[t]he theory upon which plaintiff relies . . . , is novel, untested, and does not provide any assurance of eventually prevailing on the merits").

Plaintiffs allege that they have met their burden of showing that their drug falls within the limited bounds of the exemption created by the 1938 grandfather clause and is, therefore, not a "new drug" for which they must obtain FDA premarket approval. Compl. ¶¶ 33, 125.  In order to qualify for the exemption, plaintiffs must provide "the formulas, labeling, and evidence of marketing," 21 C.F.R. § 314.200(e)(2), necessary to demonstrate that the labeling for *their* drug, with the precise composition of active and inactive ingredients, "contained the same representations concerning the conditions of its use," in 1938 that it presently includes.  21 U.S.C. § 321(p).

---

[5]  Plaintiffs do not argue that their drug is exempt by virtue of the 1962 grandfather clause.  Were they to advance such an argument, it would suffer from the same infirmities as their 1938 grandfather clause claim.  In addition, even if plaintiffs met the requirements of the 1962 grandfather clause, such a showing would only exempt their drug from the effectiveness requirements of the Act.  Thus, plaintiffs' drug would still be an unapproved new drug because plaintiffs cannot show that their drug is "generally recognized as safe" for its intended uses by qualified experts.  21 U.S.C. § 321(p).

Unless the evidence produced by plaintiffs establishes that there have been no changes whatsoever in the formulation, dosage form, potency, route of administration, indication for use, or intended patient population for *their* 20 mg/ml morphine sulfate oral solution since 1938, plaintiffs' drug does not qualify for the 1938 grandfather clause exemption. *See* Laetrile Comm'r's Decision, 42 Fed. Reg. at 39,788; *see also Rutherford*, 616 F.2d at 457 (upholding Laetrile Comm'r's Decision and holding that "the 1938 grandfather provisions [we]re not applicable" because the plaintiffs had not met "the consistent labeling requirements" and "there ha[d] not been the consistency in the formula which the FDA requires").

Plaintiffs admit that they have only been marketing their drug for the past five years and have failed to produce *any* pre-1938 labeling for *their* drug. *See* Pl. Mem. at 31-32. Thus, it is impossible for Plaintiffs to demonstrate that their drug's "labeling contained the same representations concerning the conditions of its use" in 1938 that it presently contains. 21 U.S.C. § 321(p); *see also Allan Drug Corp.*, 357 F.2d at 719.

In a vain attempt to fill this critical void in their argument, plaintiffs claim that they need not produce any labeling in order to qualify for the 1938 grandfather clause because "most pre-1938 drugs were not marketed or dispensed with modern product labels, but were compounded by pharmacists to order at various strengths based on patient need." Pl. Mem. at 30. Plaintiffs contend that in place of the labeling required under the statute, this Court should consider excerpts from drug "treatises and compendia" and "manuals or other written material"

31

establishing "that oral solutions of Morphine Sulfate, in this concentration, were on the market between 1906 and 1938." *Id.* at 28, 31-32.  This argument is baseless for many reasons.

First, Congress was presumably aware of the methods and manner in which drugs were manufactured and distributed in 1938, when it drafted the grandfather clause.  If drugs lacked labeling at that time, then Congress' requirement that products that were on the market prior to 1938 and contain the same labeling that they contained prior to 1938 would be wholly inexplicable.  Instead, Congress would have used the words "treatises and compendia," "manuals," or other language akin to that now proposed by plaintiffs.  *Id.* at 31-32.  Accepting plaintiffs' argument would require the Court to "do violence to the plain language of the statute" and at the same time read in to the statute entirely new language.  *Mansell v. Mansell*, 490 U.S. 581, 594 (1989); *see also Rutherford*, 442 U.S. at 555 ("Only when a literal construction of a statute yields results so manifestly unreasonable that they could not fairly be attributed to congressional design will an exception to statutory language be judicially implied.").

Second, plaintiffs offer no support whatsoever for their novel contention that in enacting the 1938 grandfather clause, Congress intended for the large number of drugs then compounded to be forever exempt from the FDCA's safety requirements. Pl. Mem. at 30; *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 360-61 (2002) ("Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient."). Because "[c]ompounding is typically used to prepare

medications that are not commercially available, such as medication for a patient who is allergic

to an ingredient in a mass-produced product," compounded drugs by their very nature are not

produced with consistent formulations, dosage forms, potencies, routes of administration,

indications for use, or intended patient populations. *Id.* at 361; *see also id.* at 370 (contrasting

"compounded drugs produced on such a small scale that they could not undergo safety and

efficacy testing" from manufactured drugs "produced and sold on a large enough scale that they

could undergo such testing"). In the absence of such consistency, it would be impossible for

compounded drugs to establish a history of safe use justifying their exclusion from the FDCA's

safety requirements under the 1938 grandfather clause. *See United States v. Vital Health Prods.*,

786 F. Supp. 761, 774 (E.D. Wis. 1992) (finding that although "many of the ingredients in [a

drug] may have been used and sold prior to 1962," the exemption was inapplicable because

"[e]ven if the individual components of the drugs could have qualified for exemption under the

grandfather clause, the defendants have not shown that the combinations . . . were commercially

used or sold before 1962").

Not surprisingly, no court evaluating the scope of the 1938 grandfather clause has found

that Congress intended to exempt compounded drugs, which lack the consistent "labeling"

required under the 1938 grandfather clause. *See, e.g., Bentex Ulcerine*, 469 F.2d at 879 (finding

that evidence was "not impressive" that showed that a "drug was used, prescribed and

enthusiastically endorsed by a few physicians in Memphis, Tennessee . . . and sold to no more

than perhaps 150 to 200 doctors in some two or three neighboring states"); *Durovic*, 479 F.2d at 251 (finding that the evidence "established that, as of October 9, 1962, the identity and composition of [the drug] was so completely unknown that it could not, for that reason, have been generally recognized among qualified experts as safe, even in the narrow sense, for its indicated use"). Were it otherwise, any drug included in a pre-1938 treatise or drug compendia would qualify for the 1938 grandfather clause and be exempt from the FDCA's safety requirements. *See* United States Pharmacopeia ("USP"), *Listing of "Pre-1938" Products*, attached to Pl. Ex. G (listing over 100 drugs referenced in pre-1938 pharmaceutical literature that would, under plaintiffs' theory, also be exempt from safety and effectiveness requirements by virtue of the 1938 grandfather clause. This document also states that "[t]he listing of these products should not be interpreted as an attestation by USP as to their actual availability or the general recognition of safety and efficacy of the articles for medical or legal purposes or that a final determination has been made by the FDA.").

Plaintiffs have not produced any pre-1938 labeling for their drug product, much less any such labeling showing that in 1938 their drug product was on the market in the identical formulation, dosage form, potency, route of administration, indications for use, or intended patient population. Thus, they cannot carry their burden of showing that their drug meets the requirements of the 1938 grandfather clause, which must be construed "strictly against one who invokes it." *Allan Drug Corp.*, 357 F.2d at 718. "Absent exemption by either the grandfather

34

clause of 1938, or the grandfather clause of 1962, . . . classification [as a "new drug"] requires

the filing of a new drug application and subsequent FDA approval before the drug may be

administered." *Rutherford v. United States*, 806 F.2d 1455, 1457 (10th Cir. 1986) (*Rutherford*

*II*). Accordingly, even if this court were to reach the merits in this case, Plaintiffs would have no

likelihood of success.

## C.   FDA Was Not Arbitrary and Capricious in Denying Expedited Review of the NDA and Refusing to Extend the Unapproved Marketing Grace Period

Plaintiffs allege that FDA's denial of plaintiff Lannett's request for priority review of its

NDA and refusal to further extend the grace period for plaintiffs to continue marketing their

unapproved drug deprived them of a "level playing field." Pl. Mem. at. 22. The FDA actions

that plaintiffs challenge are subject to review by the Court under the Administrative Procedure

Act ("APA"), and may be disturbed only if "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential

to the agency. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

Indeed, the courts "accord agency action a presumption of validity; the burden is on the

[plaintiff] to demonstrate that the action is arbitrary and capricious." *Copar Pumice Co. v.

Tidwell*, 603 F.3d 780, 793 (10th Cir. 2010). A reviewing court must consider whether the

agency's decision was based upon a consideration of the relevant factors and whether there has

been a clear error of judgment. *Overton Park*, 401 U.S. at 416. But, "the scope of review under

this standard is narrow, and [a court] may not substitute [its] judgment for that of the agency."
*Ross v. FHA*, 162 F.3d 1046, 1050 (10th Cir. 1998).

Plaintiffs contend that FDA's decision to designate Roxane's NDA for priority review
and deny the same classification to their drug was arbitrary and capricious. Not so. FDA did
nothing more than follow its well established policies for the designation of certain NDAs for
priority review. *See Review Classification Procedure* at 2 (A"priority" designation directs
FDA's "overall attention and resources to the evaluation" to the NDA so designated and sets a 6-
month deadline for FDA to complete its review); *cf.* FDAAA, § 101(c) (setting a 10-month
deadline for "standard" NDA review). FDA gives an NDA priority designation when a drug has
"the potential for providing a significant improvement in the treatment, prevention, or diagnosis
of a disease when compared to" other drugs or treatments for the same disease. *Review
Classification Procedure*, at 2. The lack of an approved drug for the treatment of a condition
weighs in favor of granting a priority review designation. *Id.*

At the time Roxane submitted its NDA (six months before plaintiff Lannett submitted its
NDA), there was no approved 20 mg/ml morphine sulfate oral solution. Thus, in accordance
with FDA's established procedures, Roxane's NDA received priority designation. *Id.* Had
plaintiff Lannett been the first to file an NDA for the drug, its NDA would have received the
treatment that Roxane received, as plaintiffs concede they were told by FDA. See Pl. Mem. Ex.
M ¶ 15. Plaintiffs had the same notice and opportunity to seek approval for their drug as all other

manufacturers of unapproved morphine sulfate oral solutions. *See, e.g., Unapproved Drugs CPG* ("The issuance of this guidance [in June 2006,] is intended to provide notice that any product that is being marketed illegally is subject to FDA enforcement action at any time."). In fact, plaintiffs received letters from FDA stating that "there are no approved morphine sulfate oral solution 20 mg/ml products being marketed in the U.S." and urging them to contact the agency to "secure approval for unapproved drugs they are currently marketing." FDA April 9, 2009, Letter (reiterating the Agency's "expectation that all firms that market unapproved drugs to the American public submit the required applications to obtain approval").

Rather than file an NDA as FDA requested, plaintiffs insisted that their drug was exempt from the FDCA's premarket approval requirements under the 1938 grandfather clause. When plaintiff Lannett finally filed its NDA, it was a month after Roxane's NDA was already *approved*. Under these circumstances, FDA cannot be faulted for designating plaintiff Lannett's NDA for standard review.

Similarly, FDA reasonably refused to further extend the 180-day deadline for plaintiffs (and others similarly situated) to cease manufacturing and distributing their unapproved morphine sulfate oral solution. For the past five years, plaintiffs have been illegally marketing an unapproved drug and have only been able to continue their violative conduct because of limited agency resources and a conscious exercise of FDA's enforcement discretion in light of patient needs and the lack of any approved product. Because FDA gave everyone the same notice at the

same time and encouraged all to apply, and now intends to do exactly what it said 15 months ago it would do, FDA's actions are not unreasonable.

Moreover, FDA has a strong policy interest in maintaining the limited grace period established for Plaintiffs and the other manufacturers of morphine sulfate oral solutions. As FDA has explained in its Marketed Unapproved Drugs CPG, "[t]he shorter the grace period, the more likely it is that the first company to obtain approval will have a period of de facto exclusivity before other products obtain approval. . . . FDA hopes that this period of marketing exclusivity will provide an incentive to firms to be the first to obtain approval to market a previously unapproved drug." *Id.* at 6-7. "[O]btaining FDA approval for a new drug is a costly process," and one undertaken successfully by Roxane. *W. States Med. Ctr.*, 535 U.S. at 369. If those marketing unapproved drugs come to believe that FDA will curtail or eliminate marketing exclusivity periods for newly approved drugs in response to pressure from unapproved competitors, they will no doubt be less inclined to expend the considerable effort and resources necessary to obtain premarket approval. And FDA will have lost an important tool in its effort to achieve voluntary compliance from manufacturers. Accordingly, FDA was not arbitrary or capricious in refusing to further extend the grace period for the marketing of unapproved morphine sulfate solutions until plaintiffs successfully obtain an approved NDA for their drug.

**II.      Plaintiffs Have Not Demonstrated That They Will Suffer Irreparable Injury in the Absence of Emergency Relief**

Plaintiffs have also failed to demonstrate that they will suffer irreparable harm absent such emergency relief.  Plaintiffs contend that they will "likely be unable to successfully regain the market share that [they] will lose if . . . forced to remove [their] product from the market" if they elect to comply with FDA's July 24, 2010 deadline.  Pl. Mem. at 8.  Their conclusory statements of possible economic harm lack both detail and factual support and are thus too speculative to merit preliminary injunctive relief.  *RoDa Drilling Co.*, 552 F.3d at 1210 ("Purely speculative harm will not suffice, but rather, a plaintiff . . . [must] show a significant risk of irreparable harm . . . to have satisfied his burden.") (citation and quotation marks omitted).  Plaintiffs' argue that the drug product at issue "accounts for approximately 33% of Cody's net profits."  Pl. Mem. at 16.  There is no mention of a percentage as it related to Lannett.  However, plaintiffs also concede that their sales "have seen a precipitous drop in monthly sales since December 2009."  *Id.* at 35; *see also id.* at 20 n.14.  Plaintiffs' vague assertions about their monetary harm are clearly insufficient to establish irreparable harm.

Even if the economic injuries alleged by Plaintiffs were sufficiently concrete and significant to warrant consideration, plaintiffs still could not establish irreparable harm because they are seeking a preliminary injunction to permit them to continue illegally marketing unapproved narcotic drugs.  Assuming that they comply with the deadline, they "would suffer only the 'harm' of being [required] to refrain from illegal activity," and they can "have no vested

39

interest in an illegal business activity." *United States v. Rx Depot, Inc.*, 290 F. Supp. 2d 1238, 1248 (N.D. Okla. 2003) (citing *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2d Cir. 1972)).

Finally, Plaintiffs' "delay in seeking preliminary relief cuts against finding irreparable injury." *RoDa Drilling Co.*, 552 F.3d at 1211. Plaintiffs entered the market five years ago without first obtaining an approved NDA for their drug despite the fact that the premarket approval process has been a fixture of the regulatory landscape since passage of the FDCA in 1938. Plaintiffs received warning letters from FDA 16 months ago, on March 30, 2009, directly notifying them that FDA believes premarket approval is required for their drug. On March 1, 2010, FDA informed plaintiffs that they would need to cease their unapproved marketing by July 24, 2010. Even so, plaintiffs waited nearly five months, just three days before the deadline, to bring the present action. "Delay of this nature undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (citation and quotation marks omitted).

III.    **Entry of Injunctive Relief Would be Contrary to the Interests of FDA and the Public.**

Plaintiffs have also failed to show that any potential harm to their economic interests in the absence of injunctive relief outweighs the potential harm to other parties, or that the entry of the relief it seeks would further the public interest—the third and fourth requirements for

preliminary injunctive relief. FDA is charged with "promot[ing] the public health by promptly
and efficiently . . . taking appropriate action on the marketing of regulated products" to ensure
that "drugs are safe and effective." 21 U.S.C. § 393(b). As such, FDA's interest coincides with
the public interest. *See Diapulse Corp.*, 457 F.2d at 28 ("The passage of the [FDCA] is, in a
sense, an implied finding that violations will harm the public and ought, if necessary, be
restrained.") (citing *United States v. City and County of San Francisco*, 310 U.S. 16 (1940)).

FDA's ability to enforce its statutory mandate would be frustrated if, before the Agency
has even taken action, a member of the regulated industry could file suit to challenge FDA's
jurisdiction over its products. FDA issues hundreds of warning letters each year. *See* FDA
Enforcement Story, Ch. 10, *available at* http://www.fda.gov/ICECI/EnforcementActions/
WarningLetters/default.htm. Allowing a declaratory judgment or injunction action against the
Agency after it issued a warning letter would wreak havoc with FDA's priorities and force it to
shift its resources from activities that are most pressing for the public health in order to defend
such suits.[6] Such interference with FDA's responsibility to ensure the safety and efficacy of
drugs would cause significant harm to the Agency and the public. Therefore, the public interest
would not be served by granting plaintiffs the emergency relief they seek. *See Abbott Labs.*, 387

---

[6] It worth noting that although FDA issued 445 warning letters in 2008, the most recent
year statistics are available, it filed only 8 seizures and 5 injunctions. FDA Enforcement Story
10-2.

U.S. at 156 ("It is scarcely to be doubted that a court would refuse to postpone the effective date

of an agency action if . . . that delay would be detrimental to the public health or safety.").

### CONCLUSION

For all of the reasons discussed above, plaintiffs' motion for a temporary restraining order

and preliminary injunction should be denied.

DATED this 22nd day of July, 2010.

Of Counsel:

MARK B. CHILDRESS
Acting General Counsel

RALPH S. TYLER
Chief Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

JENNIFER ZACHARY
Associate Chief Counsel
United States Department of
Health and Human Services
Office of the General Counsel
10903 New Hampshire Avenue
Building 32, Room 4330
Silver Spring, MD 20993-0002
Tel: 301-796-8724

Respectfully submitted,

_for_ DRAKE CUTINI *(Pro Hac Vice Pending)*
Trial Attorney
Office of Consumer Litigation
Department of Justice
Civil Division
P.O. Box 386
Washington, D.C. 20044
Tel: 202-307-0044
Fax: 202-514-8742
drake.cutini@usdoj.gov

CHRISTOPHER A. CROFTS
United States Attorney

NICHOLAS VASSALLO
Assistant United States Attorney
District of Wyoming
P.O. Box 668
Cheyenne, WY 82003-0668
Tel: 307-772-2124
Fax: 307-772-2123
nick.vassallo@usdoj.gov

42

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that on July 22, 2010, a true and correct copy of the

foregoing **Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining**

**Order and Preliminary Injunction** was electronically filed and consequently served upon all

counsel of record.

Office of the United States Attorney

43